ACCEPTED
14-14-00578-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
3/13/2015 2:36:56 PM
CHRISTOPHER PRINE
CLERK

## No. 14-14-00578-CV

_____

IN THE COURT OF APPEALS
FOR THE FOURTEENTH DISTRICT OF TEXAS
HOUSTON, TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
3/13/2015 2:36:56 PM
CHRISTOPHER A. PRINE
Clerk

_____

TRELLTEX, INC. d/b/a TEXCEL

Appellant/Cross-Appellee

vs.

INTECX, L.L.C. d/b/a ROCKY MOUNTAIN INDUSTRIAL TECHNOLOGIES

Appellee/Cross-Appellant

_____

*On Appeal from the 295th Judicial District Court of Harris County, Texas*
*Cause No. 2012-52277*

_____

**APPELLANT'S RESPONSE TO APPELLEE'S CROSS-APPEAL**
**AND REPLY IN SUPPORT OF APPELLANT'S BRIEF**

_____

DOW GOLUB REMELS & BEVERLY, LLP

Keith M. Remels
Texas Bar No. 16765800
Stephanie A. Hamm
Texas Bar No. 24069841
9 Greenway Plaza, Suite 500
Houston, Texas 77046
Telephone: (713) 526-3700
Facsimile: (713) 526-3750

ATTORNEYS FOR APPELLANT
TRELLTEX, INC. d/b/a TEXCEL

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................. iii

ISSUE PRESENTED BY CROSS-APPELLANT'S BRIEF ............................... vii

PART ONE: RESPONSE TO RMIT'S CROSS-APPEAL.....................................2

SUMMARY OF THE ARGUMENT .....................................................................2

ARGUMENT AND AUTHORITIES......................................................................3

    I.     THE RECORD DEMONSTRATES THAT RMIT WAIVED ITS
          RIGHT TO RECEIVE ANY ALLEGED UNDERPAID
          COMMISSIONS OWED BY TEXCEL AFTER MAY 1, 2006 .........................3

    II.    THE COURT SHOULD AFFIRM THE TRIAL COURT'S
          FINDING OF WAIVER..............................................................................17

PART TWO: REPLY IN SUPPORT OF APPELLANT'S BRIEF .......................18

    I.     THE DAMAGES AWARDED BY THE TRIAL COURT ARE
          INDISPUTABLY BARRED BY LIMITATIONS ............................................18

    II.    THE TRIAL COURT'S CONSTRUCTION OF THE AGREEMENT
          RENDERS THE "NOTE" MEANINGLESS ...................................................24

    III.   THE TRIAL COURT ERRED BY APPLYING COLORADO LAW ...................27

    IV.   THE TRIAL COURT INCORRECTLY AWARDED ADDITIONAL
          DAMAGES TO INTECX, LLC................................................................30

CONCLUSION AND PRAYER .........................................................................32

CERTIFICATE OF COMPLIANCE...................................................................33

CERTIFICATE OF SERVICE ..........................................................................34

# INDEX OF AUTHORITIES

## CASES

*Alford, Meroney & Co. v. Rowe*,
    619 S.W.2d 210 (Tex. Civ. App.—Amarillo 1981, writ ref'd n.r.e.) ...................................................................................................3, 16

*Amouri v. Sw. Toyota, Inc.*,
    20 S.W.3d 165 (Tex. App.—Texarkana 2000, pet. denied) .........................13

*Barker v. Eckman*,
    213 S.W.3d 306 (Tex. 2006) ........................................................................22

*Capstone Healthcare Equip. Svcs. v. Quality Home Health Care, Inc.*,
    295 S.W.3d 696 (Tex. App.—Dallas 2009, pet. denied) .............................20

*City of Keller v. Wilson*,
    168 S.W.3d 802 (Tex. 2005) ........................................................................17

*Compaq Computer Corp. v. LaPray*,
    135 S.W.3d 657 (Tex. 2004) ........................................................................27

*Davis Apparel v. Gale-Sobel, a Div. of Angelica Corp.*,
    117 S.W.3d 15 (Tex. App.—Eastland 2003, no pet.).............................19, 21

*Dow Chemical Co. v. Francis*,
    46 S.W.3d 237 (Tex. 2001) .......................................................................4, 17

*El Paso Field Svcs., L.P. v. MasTex N. Am., Inc.*,
    389 S.W.3d 802 (Tex. 2012) ........................................................................26

*F.D. Stella Prods. Co. v. Scott*,
    875 S.W.2d 462 (Tex. App.—Austin 1994, no writ) ...................................21

*Foley v. Capital One Bank, N.A.*,
    383 S.W.3d 644 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ........15, 16

*Forbau v. Aetna Life Ins. Co.*,
    876 S.W.2d 132 (Tex. 1994) ........................................................................26

*Hart v. Int'l Tel. & Telegraph Corp.*,
  546 S.W.2d 660 (Tex. App.—San Antonio 1977, writ ref'd n.r.e.)..............19

*Hemenway Co., Inc. v. Sequoia Pac. Realco*,
  590 S.W.2d 545 (Tex. Civ. App.—San Antonio 1979, writ ref'd
  n.r.e.) ..............................................................................................3

*Hollander v. Capon*,
  853 S.W.2d 723 (Tex. App.—Houston [1st Dist.] 1993, writ
  denied) .............................................................................................19

*In re Estate of Miller*,
  446 S.W.3d 445 (Tex. App.—Tyler 2014, no pet.)................................16, 17

*In re General Electric Corp.*,
  203 S.W.3d 341 (Tex. 2006) .........................................................................9

*In re Key Equip. Finance Inc.*,
  371 S.W.3d 296 (Tex. App.—Houston [1st Dist.] 2012, no pet.).................13

*Intermedics, Inc. v. Grady*,
  683 S.W.2d 842 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd
  n.r.e.) .............................................................................................19

*Johnston v. McKinney Am, Inc.*,
  9 S.W.3d 271 (Tex. App.—Houston [14th Dist.] 1999, pet.
  denied) .............................................................................................24

*Lyle v. Jane Guinn Revocable Trust*,
  365 S.W.3d 341 (Tex. App.—Houston [1st Dist.] 2010, no pet.)...........20, 21

*Med. Sales & Consulting Gp. v. Plus USA Orthopedics, Inc.*,
  2011 WL 5075970 (S.D. Cal. Oct. 25, 2011)...............................................29

*Morton v. Hung Nguyen*,
  369 S.W.3d 659 (Tex. App.—Houston [14th Dist.] 2012),
  *rev'd in part on other grounds*, 412 S.W.3d 506 (Tex. 2013) .....................14

*PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*,
  146 S.W.3d 79 (Tex. 2004) .........................................................30, 31, 32

iv

*PennWell Corp. v. Ken Assoc. Inc.*,
    123 S.W.3d 756 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ..............27

*Price Pfister, Inc. v. Moore & Kimmey, Inc.*,
    48 S.W.3d 341 (Tex. App.—Houston [14th Dist.] 2001, pet.
    denied) ...................................................................................................4

*Rader v. Electronic Payment Sys., LLC*,
    2012 WL 4336175 (D. Colo. Sept. 21, 2012) ...............................................29

*Rodriguez v. Classical Custom Homes, Inc.*,
    176 S.W.3d 928 (Tex. App.—Dallas 2005, no pet.) .......................................3

*Slusser v. Un. Bankers Ins. Co.*,
    72 S.W.3d 713 (Tex. App.—Eastland 2002, no pet.).....................................21

*Spin Doctor Golf, Inc. v. Paymentech, L.P.*,
    296 S.W.3d 354 (Tex. App.—Dallas 2009, pet. denied) ........................19, 20

*Stine v. Stewart*,
    80 S.W.3d 586 (Tex. 2002) ..................................................................19, 22

*Tenneco Inc. v. Enter. Prods. Co.*,
    925 S.W.2d 640 (Tex. 1996) ..................................................................3, 14

*Ulico Cas. Co. v. Allied Pilots Ass'n*,
    262 S.W.3d 773 (Tex. 2008) .......................................................................3

*Vickrey v. Comm'n for Lawyer Discipline*,
    5 S.W.3d 241 (Tex. App.—Houston [14th Dist.] 1999, pet.
    denied) .................................................................................................16

*Woods v. William M. Mercer, Inc.*,
    769 S.W.2d 515 (Tex. 1988) ....................................................................22

## STATUTES

TEX. CIV. PRAC. & REM. CODE § 16.004.................................................................19

v

## RULES

TEX. R. APP. P. 9.4(i)(1) ........................................................................33

TEX. R. APP. P. 9.4(e) ...........................................................................33

TEX. R. CIV. P. 299 ..............................................................................17

## ISSUE PRESENTED BY CROSS-APPELLANT'S BRIEF

1. Whether the trial court properly found that RMIT waived its right to receive any alleged underpaid commissions owed by Texcel after May 1, 2006.

No. 14-14-00578-CV
_____

IN THE COURT OF APPEALS
FOR THE FOURTEENTH DISTRICT OF TEXAS
HOUSTON, TEXAS
_____

TRELLTEX, INC. d/b/a TEXCEL

Appellant/Cross-Appellee

VS.

INTECX, L.L.C. d/b/a ROCKY MOUNTAIN INDUSTRIAL TECHNOLOGIES

Appellee/Cross-Appellant
_____

*On Appeal from the 295th Judicial District Court of Harris County, Texas*
*Cause No. 2012-52277*
_____

**APPELLANT'S RESPONSE TO APPELLEE'S CROSS-APPEAL
AND REPLY IN SUPPORT OF APPELLANT'S BRIEF**
_____

TO THE HONORABLE FOURTEENTH COURT OF APPEALS:

Appellant, Trelltex, Inc. d/b/a Texcel (Texcel), submits this (i) response to

Cross-Appellant's Brief, filed by Appellee, Intecx, L.L.C. d/b/a Rocky Mountain

Industrial Technologies, Inc. (RMIT); and (ii) reply in support of Texcel's

Appellant's Brief.

1

# PART ONE: RESPONSE TO RMIT'S CROSS-APPEAL

## SUMMARY OF THE ARGUMENT

RMIT's cross-appeal is limited to the contention that there was either no evidence or insufficient evidence to support the trial court's conclusion that RMIT waived its right to receive any alleged underpaid commissions owed by Texcel after May 1, 2006.[1] The evidence in the record, however, demonstrates that (i) RMIT, for more than ten years, received monthly detailed sales reports from Texcel that clearly reported the 5% commissions being paid on each of RMIT's sales; (ii) RMIT reviewed these monthly detailed sales reports; (iii) on at least one occasion, RMIT contacted Texcel to discuss its commission check; (iv) the contract at issue was purportedly assigned to the Appellee, Intecx, LLC d/b/a RMIT, pursuant to a bill of sale in April 2006 (the month before the trial court determined that RMIT waived its right to receive any alleged underpaid commissions owed by Texcel); (v) RMIT knew that Texcel was paying it a 5% commission; and (vi) RMIT never once complained about its 5% commission rate until after Texcel terminated the Agreement in 2012. This evidence is sufficient to prove that RMIT waived its right to receive a 9% commission rate as of May 1, 2006. Accordingly, the trial court correctly determined that Texcel proved its affirmative defense of waiver. RMIT's sole point of error should be overruled.

---

[1]Cross-Appellant's Brief, pp. 6–12.

2

## ARGUMENT AND AUTHORITIES

**I.** **THE RECORD DEMONSTRATES THAT RMIT WAIVED ITS RIGHT TO RECEIVE ANY ALLEGED UNDERPAID COMMISSIONS OWED BY TEXCEL AFTER MAY 1, 2006.**

Waiver is an intentional relinquishment of a known right and is either made expressly or indicated by conduct that is inconsistent with an intent to claim the right. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008).

> Evidence of waiver generally takes one of three forms. There may be evidence of an express renunciation of the known right. There may be evidence of **silence or inaction, coupled with knowledge of the known right, for such an unreasonable period of time as to indicate an intention to waive the right**. Finally, waiver may be evidenced by **other conduct of the party knowingly possessing the right of such a nature as to mislead the opposite party into an honest belief that the waiver was intended or assented to**.

*Alford, Meroney & Co. v. Rowe*, 619 S.W.2d 210, 213 (Tex. Civ. App.—Amarillo 1981, writ ref'd n.r.e.) (emphasis added). *See also Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996) ("Silence or inaction, for so long a period as to show an intention to yield [a] known right, is [] enough to prove waiver."); *Rodriguez v. Classical Custom Homes, Inc.*, 176 S.W.3d 928, 932 (Tex. App.—Dallas 2005, no pet.) (same); *Hemenway Co., Inc. v. Sequoia Pac. Realco*, 590 S.W.2d 545, 548 (Tex. Civ. App.—San Antonio 1979, writ ref'd n.r.e.) ("Intentional conduct that is inconsistent with the claim of a right constitutes a waiver.").

3

The trial court concluded that "Texcel has proven RMIT waived its right to receive the underpaid commission that were owed to RMIT by Texcel after May 1, 2006."[2] RMIT admits that the trial court made the following findings of fact in support of its conclusion:

- "After May 1, 2006, RMIT received monthly statements from Texcel that showed the amount of the sales each month and the amount of the commissions that were paid."

- "RMIT could have calculated that it was only being paid 5% from those monthly statements after May 1, 2006 and RMIT never made those calculations."

- "After May 1, 2006, RMIT never complained about underpaid commissions before the contract was terminated by Texcel."[3]

*See* Cross-Appellant's Brief, p. 7.[4] But RMIT then goes on to say that there is no evidence (or insufficient evidence)[5] in the record that RMIT ever "unequivocally

---

[2]CR 557, Conclusion No. 4.

[3]CR 556, Finding Nos. 13–15.

[4]Although RMIT's brief cites to Finding Nos. 11–13 at page 549 of the Clerk's Record, its citation is to an unsigned, proposed draft of findings of fact and conclusions of law submitted to the trial court by RMIT. *See* CR 545–551. The Findings of Fact and Conclusions of Law signed by the trial court are found at pages 554–558 of the Clerk's Record.

[5]RMIT's brief does not distinguish between its no evidence and insufficient evidence arguments. As the Court is aware, when reviewing a factual-sufficiency challenge, appellate courts must assess all of the evidence and may not substitute its judgment for that of the trier of fact. Further, when the challenge is to a finding on which the prevailing party had the burden of proof, an appellate court may reverse the judgment **only if the challenged finding shocks the conscience or clearly shows bias, or if the favorable evidence is so weak as to make the judgment clearly wrong and manifestly unjust**. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (emphasis added); *see also Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 347 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

4

manifested any intention to accept commissions of less than 9%." *Id.* at p. 9–10. The contention that there is no evidence in the record to support the trial court's finding of implied waiver is clearly false. And as to the argument that the evidence is insufficient, RMIT is also incorrect.

Texcel's opening brief detailed the significant evidence in the record supporting the trial court's finding of waiver. *See* Appellant's Brief, pp. 15–18. And contrary to RMIT's contentions, the evidence supporting waiver is substantially more than mere evidence that (i) RMIT accepted payments for less than what it contends it was owed or (ii) RMIT was simply inattentive. [6] Specifically, it is undisputed that RMIT—**for more than ten years**—received from Texcel **monthly** detailed sales reports from which its commission rate could easily be calculated.[7] Robert Merkin admits that he looked at these reports, and, on at least one occasion, he contacted Texcel on behalf of RMIT to discuss its commission check.[8] Although RMIT's lawyer now contends that these detailed sales reports were somehow "confusing" and contained "numeric entries under a

---

[6]Cross-Appellant's Brief, p. 10.

[7]RR Vol. 6 at 151–RR. Vol. 8 at 68 (Defendant's Trial. Ex. 16) (RMIT monthly detailed sales analyses); RR Vol. 3 at 43:13–44:5, 44:20–52:10.

[8]RR Vol. 3 at 21:9–19, 44:13–18; RR Vol. 8 at 81 (Defendant's Trial Ex. 20).

5

commissions column that resembled IP addresses, not dollars,"[9] Mr. Merkin had no

trouble deciphering these reports at trial:

> Q:  And it was your testimony a few minutes ago that you would use these detailed sales reports to do what you call [a] sales analysis to see who was buying and who wasn't buying, correct?
>
> A:  Correct.
>
> Q:  And let's just take a look at the very first page of Exhibit 16, if you would. It's Texcel 334 there. Do you see that?
>
> A:  Yep. Yes.
>
> Q:  Okay. If you look at that, this is Applied Industrial Technologies. So give me an example – when you look through here and you see each item that they bought . . . you knew what these products were, right?
>
> A:  Yeah. They were buying skirt board.
>
> …
>
> Q:  Okay. So you got this and as part of your sales analysis, you would see that Applied Industrial Technologies bought $2,060 that month, right?
>
> A:  Yes.
>
> Q:  And look with me – and I just find this really curious. If you look with me at the very first entry on that, the first order was $240 and if you go over to the very next column, it says the commission was $12, right?
>
> …
>
> A:  Yep.
>
> Q:  True?

---

[9]Cross-Appellant's Brief, p. 11.

A:     Yes.

Q:     And not to belabor the point, but you've got a bachelor of science in engineering. You know that's 5 percent, right?

A:     If I did the calculation, yes, I could determine that.
…
Q:     And you'll agree with me that you don't have to do any complex calculation to figure out that $12 is 5 percent of 240, right?

A:     That's not a complex calculation, no.

Q:     And if you go just a few lines down to the last order that Applied Industrial Technologies made, it was $50 and the commission was $2.50, right?

A:     If you say so. I'm not looking at that line. Which account?

Q:     It's also for Applied Industrial Technologies for Bozeman, Montana?
…
A:     Bozeman, yes, I see it.

Q:     That jumps out at you as being a round number of 5 percent, doesn't it?

A:     If you looked, it could jump out at you, yes.
…
Q:     And here on Texcel 339, it says the sales were a little over 25,000 and the commission was a little over $1250, right?

A:     Right.

Q:     Again, that['s] pretty easy to tell that's 5 percent, right?

A:     You can do the calculation. I think we said that now three times.[10]

_____

[10]RR Vol. 3 at 44:15–52:7.

Additionally, the very contract at issue in this case was purportedly assigned to the Appellee, Intecx, LLC d/b/a RMIT, pursuant to a bill of sale in April 2006 (which the trial court clearly considered to be a significant event in light of its finding of waiver as of May 1, 2006).[11] And, Mr. Merkin's testimony at trial made clear that RMIT knew that Texcel was paying RMIT a 5% commission rate.[12] Yet, RMIT never once complained to Texcel about its 5% commission rate until after Texcel terminated the Agreement in 2012.[13] Had it done so, or had it otherwise insisted upon a higher commission rate, Texcel would simply have terminated the Agreement according to its terms and limited its liability for damages.[14] But because RMIT never said or did anything consistent with its purported right to continue receiving a 9% commission rate despite the numerous expansions to its

---

[11]RMIT erroneously states in its brief that Rocky Mountain Industrial Technologies, Inc. is the successor of Appellee, Intecx, LLC d/b/a Rocky Mountain Industrial Technologies. Cross-Appellant's Brief, p. vii. The opposite is true—Rocky Mountain Industrial Technologies, Inc. is the predecessor of Appellee, Intecx, LLC. This distinction is important, particularly in light of the trial court's finding of waiver as of May 2006—the very next month following Rocky Mountain Industrial Technologies' assignment of the Agreement to Intecx, LLC.

[12]RR Vol. 3 at 56:4–58:4 (set out in Appellant's Brief at pages 16–17); *see also* RR Vol. 4 at 170–171 (Plaintiff's Trial Ex. 12).

[13]RR Vol. 3 at 127:8–11.

[14]*See, e.g.,* RR Vol. 3 at 161:9–20 (testimony of E. Nasta) ("Q: If you had talked to Mr. Merkin before this contract was signed and you had talked about a 20 percent commission rate, it is your position that under this note, Mr. Merkin could have suggested that the contract rate – he could then say, well, the contract rate goes up to 20 percent? A: Well, if he had said that, I had, you know, everything available to me to remedy the situation, which is, no, we didn't agree to that and, no, we don't agree to 20 percent. So if we disagree, let's just send each other 30 days' notice and be done with my damages.").

sales territory, Texcel reasonably assumed in good faith that it was properly compensating RMIT under the Agreement. *See* RR Vol. 3 at 156:14–17 (testimony of E. Nasta) ("Q: Do you believe at all times Texcel was paying commissions to RMIT as provided for in [the Agreement]? A: Yes, absolutely, yes.").

Although RMIT cites to *In re General Electric Corp.*, 203 S.W.3d 314 (Tex. 2006) for the proposition that "[c]onduct that might be inattention or a lack of care are not sufficient to prove the requisite intent for waiver based upon silence or inaction," *In re General Electric Corp.* is distinguishable from the facts and circumstances in this case. The issue in *In re General Electric Corp.* was whether General Electric waived its contractual right to a non-jury trial by failing to object for **ten months** after the opposing party moved the case to the jury docket. 230 S.W.3d at 314. The only notice General Electric received of the change, though, was an inconspicuous notation on the court's notice of trial setting, in which the trial's date and time was moved up one line from the "non-jury trial" line to the "jury trial" line. *Id.* at 315–16. But as soon as General Electric noticed that the case was no longer on the court's non-jury docket, it objected. *Id.* Therefore, and in light of the fact that General Electric had already positively asserted its contractual right by requesting a non-jury trial when filing suit, the court was not persuaded that General Electric's conduct constituted an implied waiver. *See id.*

9

But here, RMIT received—and reviewed—monthly detailed sales reports for **125 months** and never said a word about its commission rate, despite the fact that the commission payments were clearly noted next to each and every transaction, and, as Mr. Merkin admitted at trial, the commission rate being paid by Texcel was easily calculated. It was only after Texcel terminated the Agreement that RMIT complained for the very first time. There is certainly evidence in the record to support the conclusion that RMIT did not remain silent for ten years simply because it was inattentive or exercised a lack of care, but instead that RMIT knew it was only being paid a 5% commission rate and intentionally chose not to say anything—at least until after Texcel terminated the Agreement—either because it knew that the parties had contemplated reducing RMIT's commission rate commensurate with the expansions of its territory, or because it did not want to risk its professional relationship with Texcel. After all, even assuming that the addition of Western New Mexico in 2002 had not warranted the reduction of RMIT's commission rate from 9% to 5%, as of 2006, there is no question that Texcel would never have agreed to continue paying RMIT a 9% commission rate on its greatly expanded territory. As noted above, it would have terminated the Agreement and limited its liability for damages. Given that the parties had expressly contemplated reducing RMIT's commission rate as its territory was increased, it is certainly reasonable to conclude that RMIT knew that Texcel would terminate the

10

Agreement if RMIT insisted upon a 9% commission rate despite the numerous expansions to its sales territory, and therefore intentionally remained silent.

RMIT attempts to diminish the importance of the monthly detailed sales reports that it received—and reviewed—for 125 months by arguing that "there were no commissions actually reported on the monthly sales reports provided by Texcel to RMIT until September 5, 2006."[15] This is not true. From the very beginning, the detailed sales reports contained the commissions RMIT earned on each transaction.[16] The detailed sales report contained in Defendant's Trial Exhibit 16, which begin in September 2006, are not all-inclusive—rather, they are what was produced during discovery in the course of RMIT prosecuting its claim for **underpaid commissions allegedly owed during the years 2008 to 2012**. The testimony at trial, though, demonstrates that the detailed sales reports always contained the commission information:

Q:     And Exhibit 9 is Mr. Merkin's email confirming with Mr. Palmissano his itinerary looks good for Utah and the customers they'll be calling on; is that right?

A:     Yes.

Q:     You don't have any kind of exchange like that related to the change in the commission rate, do you?

A:     We actually do.

[15]Cross-Appellant's Brief, p. 11.

[16]RR Vol. 2 at 62:10–64:3.

11

Q: What email do you have where you say, "Mr. Merkin, **we've changed your commission rate from 9 percent to 5 percent**?

A: We did that in the form of **120 some sales reports**. It's a form of communication. Email and written letter is a form of communication.[17]

Moreover, at trial, Mr. Merkin never denied that he had received the detailed sales reports each and every month since he first began representing Texcel's product line in 2001, and there is certainly no evidence in the record that the detailed sales reports changed in September 2006 to include, for the very first time, the commission payment information. RMIT's suggestion to the contrary is nothing more than a transparent attempt to mislead this Court.

RMIT also argues that "there can be no implied waiver" because "there is no evidence in the record that Mr. Merkin or anyone else at RMIT ever made any calculation of the commissions reported or knew the commissions owed were being underpaid at any time before February 2012."[18] Again, RMIT is incorrect. Mr. Merkin negotiated the 9% commission rate in the contract on behalf of RMIT, and therefore knew that the contract provided for a 9% commission rate.[19] He also

---

[17]RR. Vol. 2 at 62:6–18 (emphasis added).

[18]Cross-Appellant's Brief, p. 11.

[19]RR Vol. 2 at 38:9–40:9, 43:2–44:12; RR Vol. 3 at 22:22–23:24; RR Vol. 4 at 142–145 (Plaintiff's Trial Ex. 3); RR Col. 4 at 172–175 (Plaintiff's Trial Ex. 13).

knew, though, that Texcel was only paying 5%.[20] Further, the fact that Texcel was paying 5% was apparent on the face of each detailed sales report (e.g., $2.50 on a $50.00 sale), which Mr. Merkin admits he reviewed, so no complex "calculations" were required to determine what rate RMIT was being paid by Texcel—it is simple math.[21] Mr. Merkin's self-serving testimony that he simply "forgot"—at some unidentified point—that the contract called for 9%,[22] even if actually true, is of no consequence because he is charged with knowledge of the content of the contract. *In re Key Equip. Finance Inc.*, 371 S.W.3d 296, 302 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("[A]bsent fraud or mistake, Texas courts presume that a party who signs a contract knows its contents.") (internal citations and quotations omitted); *see also Amouri v. Sw. Toyota, Inc.*, 20 S.W.3d 165, 169 (Tex. App.—Texarkana 2000, pet. denied).

RMIT further contends that certain findings made by the trial court are inconsistent with a finding of implied waiver, namely that (i) "RMIT never expressly relinquished its right to be paid the 9% commissions before the contract was terminated by Texcel;" (ii) RMIT never approved the unilateral reduction of

---

[20]*See* Appellant's Brief, pp. 16–18 (detailing Mr. Merkin's knowledge that Texcel was paying RMIT a 5% commission rate); *see also* RR Vol. 3 at 37:13–38:4, 56:4–58:4; RR Vol. 4 at 170–171 (Plaintiff's Trial Ex. 12); RR Vol. 8 at 81 (Defendant's Trial Ex. 20).

[21] RR Vol. 3 at 21:9–19, 43:13–44:5, 44:13–52:10; RR Vol. 6–RR Vol. 8 at 68 (Defendant's Trial Ex. 16).

[22]*See* RR Vol. 3 at 58:11–17.

13

its commission from 9% to 5% under the contract;" (iii) "RMIT never intended to make Texcel's unilateral reduction of the commission from 9% to 5% valid;" and (iv) "RMIT never agreed to modify or revise the commission rate under its contract with Texcel from 9% to 5%."[23] RMIT has not established that these findings are irreconcilable with a finding of implied waiver, and it cannot do so because, as explained below, none of these findings are inconsistent with a finding of implied waiver. *See Morton v. Hung Nguyen*, 369 S.W.3d 659, 674 (Tex. App.—Houston [14th Dist.] 2012), *rev'd in part on other grounds*, 412 S.W.3d 506 (Tex. 2013) (appellate courts will not set aside a judgment because of conflicting findings of fact by a judge or jury if the conflict can be reconciled, and the court must reconcile apparent conflicts where there is any reasonable basis to do so).

First, "[t]he affirmative defense of waiver can be asserted against a party who intentionally relinquishes a known right **or engages in intentional conduct inconsistent with claiming that right**." *Tenneco Inc.*, 925 S.W.3d at 643 (emphasis added). Accordingly, the fact that RMIT never "expressly relinquished" its right to receive 9% commissions does not preclude a finding that RMIT impliedly waived such right through its silence and action for more than ten years, coupled with its knowledge that it was receiving only 5% commissions instead of 9% commissions. Second, the remaining findings all relate to Texcel's other

---

[23]Cross-Appellant's Brief, p. 10; CR 556 at Finding Nos. 16–19.

14

affirmative defenses, e.g., ratification, modification, and quasi-estoppel, and none of them preclude a finding that RMIT impliedly waived its rights under the Agreement. *See, e.g.,* CR 558 at Conclusion No. 11 ("The Defendant, Texcel, has failed to prove any of its alleged affirmative defenses other than waiver."). Simply because RMIT did not affirmatively agree to modify the terms of the Agreement or to ratify Texcel's reduction of the commission rate does not mean that RMIT could not waive its rights under the Agreement by choosing not to complain about its commission payments for more than ten years, despite receiving and reviewing detailed sales reports—which clearly noted the commission payments for every transaction—each and every month for 125 months.

Finally, although the trial court did not specifically include a finding of fact that RMIT "unequivocally manifested" an intent to waive its known right or that it had actual knowledge that it was receiving 5% instead of 9%, such findings are presumed in favor of the trial court's finding of implied waiver—and RMIT cannot now rebut the presumptions. "On appeal, an omitted element of a ground of recovery will be presumptively found in support of the judgment if three conditions are met: (1) an element of the ground of recovery was included in the findings of fact; (2) the omitted element has not been properly requested; and

15

(3) the omitted finding is supported by the evidence."[24]  "To prevent a missing element from being deemed on appeal, an appellant may request additional findings on omitted elements.  The failure to do so waives the party's right to complain on appeal about a presumed finding."[25]

"The elements of waiver [] are established by evidence that the party possessing the right (1) is aware of the right and (2)(a) expressly relinquishes it or (2)(b) acts in a manner inconsistent with, or fails to act in a manner consistent with, an intent to claim the right."  *Rowe*, 619 S.W.2d at 213–14.  The evidence is undisputed that RMIT knew that the Agreement called for a 9% commission rate, and the trial court found that RMIT never ***expressly*** relinquished its right to be paid 9%.  *See* CR 556 at Finding No. 16.  RMIT concedes that the trial court made some findings in support of its conclusion that RMIT ***impliedly*** waived its right to receive any alleged underpaid commission owed by Texcel after May 1, 2006.  *See* Cross-Appellants' Brief, p. 7.  RMIT did not request any additional findings from the trial court on the issue of waiver, so it has therefore waived its right to complain that any omitted findings of fact supported by the evidence are presumed

---

[24]*Foley v. Capital One Bank, N.A.*, 383 S.W.3d 644, 648 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (internal citations and quotations omitted); *see also Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 250 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (there is a general presumption of validity extending to the judgment of a court of general jurisdiction, regardless of whether the judgment results from a jury trial or a bench trial).

[25]*In re Estate of Miller*, 446 S.W.3d 445, 450 (Tex. App.—Tyler 2014, no pet.) (internal citations and quotations omitted).

in favor of the trial court's judgment. *In re Estate of Miller*, 446 S.W.3d at 450; *see also* TEX. R. CIV. P. 299. As detailed above, there is evidence in the record to support a finding that RMIT knew that Texcel was paying its commissions at 5% instead of 9% and intentionally chose not to say anything until after Texcel terminated the Agreement.

## II. THE COURT SHOULD AFFIRM THE TRIAL COURT'S FINDING OF WAIVER.

There is more than a mere scintilla of evidence in the record to support the trial court's conclusion that RMIT intentionally relinquished its right to receive 9% commission payments as of May 1, 2006, as evidenced by its silence and inaction for more than ten years despite its knowledge that Texcel was paying RMIT a 5% commission rate instead of a 9% commission rate. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) ("No evidence" challenges may be sustained only when the record discloses: (i) a complete absence of evidence of a vital fact; (ii) the court is barred by rules of law of evidence from giving weight to the only evidence offered to prove a vital fact; (iii) the evidence offered to prove a vital fact is no more than a mere scintilla; or (iv) the evidence establishes conclusively the opposite of the vital fact.). Moreover, RMIT has not demonstrated (and cannot demonstrate) that the trial court's finding of waiver "shocks the conscience," clearly evidences bias, or is otherwise clearly wrong or unjust. *Dow Chemical Co.*, 46 S.W.3d at 242. The Court should therefore overrule RMIT's sole point of error,

17

and affirm the trial court's finding that RMIT waived its right to receive any alleged underpaid commissions owed by Texcel after May 1, 2006.

## PART TWO: REPLY IN SUPPORT OF APPELLANT'S BRIEF

As explained below, and in Texcel's opening brief, the Court should reverse the trial court's judgment in favor of RMIT, render a take-nothing judgment on all of RMIT's claims against Texcel, render judgment in favor of Texcel on its request for declaratory relief, and remand this case to the trial court with instructions to award Texcel its attorneys' fees

### I. THE DAMAGES AWARDED BY THE TRIAL COURT ARE INDISPUTABLY BARRED BY LIMITATIONS.

In its Response, RMIT argues for the very first time that even though it filed its breach of contract lawsuit against Texcel in 2012, it is entitled to damages from Texcel going back to 2001 because "there is no dispute" that the Agreement constitutes a "continuing contract" such that limitations did not begin to run until Texcel terminated the Agreement in 2012.[26]  But RMIT's argument misconstrues both the law and the facts.  As noted in its opening brief, the Agreement is an installment contract whereby each alleged breach gave rise to a separate cause of action, and only those claims arising within four years of RMIT filing suit would

---

[26]Cross-Appellant's Brief, pp. 13–17.

18

not be barred by limitations.[27]  Accordingly, all claims for underpaid commissions arising before September 10, 2008 are barred as a matter of law.[28]

Although RMIT takes issues with Texcel's citation to *Davis Apparel v. Gale-Sobel, a Division of Angelica Corporation*, 117 S.W.3d 15, 19 (Tex. App.—Eastland 2003, no pet.)—just one of the cases cited by Texcel on this issue, albeit one that is directly on point and exceptionally instructive—the case law clearly establishes that any alleged underpaid commissions owed by Texcel more than four years before RMIT filed this lawsuit are time-barred:

> A four-year statute of limitations applies to contract actions.  TEX. CIV. PRAC. & REM. CODE § 16.004 (Vernon 2002).  A breach of contract claim accrues at the time of breach.  *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002).  When recovery is sought on an obligation payable in installments, the statute of limitations runs against each installment from the time it becomes due.  *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).  **Thus, a suit for the breach of a contract requiring payment in periodic installments may include all payments due within the four-year statute of limitations period, even if the initial breach was beyond the limitations period. Recovery of any payment more than four years overdue is barred**.  *Hollander v. Capon*, 853 S.W.2d 723, 726–27 (Tex. App.—Houston [1st Dist.] 1993, writ denied).
> …
> Like the commissions payable in *Davis Apparel* and [*Hart v. International Telephone & Telegraph Corp.*, 546 S.W.2d 660, 662 (Tex. App.—San Antonio 1977, writ ref'd n.r.e.)], Paymentech was to

---

[27]Appellant's Brief, pp. 24–28.

[28]In light of trial court's finding of implied waiver as of May 1, 2006, RMIT has waived all claims against Texcel that are not barred by the statute of limitations.  *See* CR 557 at Conclusion Nos. 4 and 5.

19

make periodic payments to Spin Doctor. Although the payments were not commissions, they were calculated periodically based on Spin Doctor's credit card sales. Neither the commission payments nor the payments payable to Spin Doctor were *fixed* payments. They were payments to be calculated on a periodic basis . . . **We hold that the parties' agreement constituted a continuing contract and claims based on breaches within four years before April 20, 2005, the date the lawsuit was filed, are not bared by limitations. As such, the initial breach that occurred prior to April 20, 2001 is barred by limitations. However, alleged contract breaches occurring after April 20, 2001 are not barred**.

*Spin Doctor Golf, Inc. v. Paymentech, L.P.*, 296 S.W.3d 354, 362–63 (Tex. App.—

Dallas 2009, pet. denied) (emphasis added).

Limitations begins to run on [a continuing] contract at the earlier of (1) the completion of the work; (2) the termination of the contract under its own terms; or (3) the anticipatory repudiation of the contract by one part and the adoption of the repudiation by the other party. **However, if the terms of a continuing contract call for fixed, period performance during the course of the agreement, a cause of action for the breach of the agreement may arise at the end of each period, before the contract is completed. The injured party has four years from each breach to bring suit**.

*Capstone Healthcare Equip. Svcs., Inc.* ex rel. *Health Sys. Gp., L.L.C. v. Quality*

*Home Health Care, Inc.*, 295 S.W.3d 696, 700 (Tex. App.—Dallas 2009, no pet.)

(internal citations and quotations omitted) (emphasis added).

[I]f the terms of an agreement call for periodic payment during the course of the contract, a cause of action for such payments may arise at the end of each period, before the contract is completed. **Therefore, the statute of limitations here, where the 1919 Assignment contemplated a monthly accounting and payment for the one-fourth royalty, only bars recovery of the royalty payments accruing more than four years prior to the filing to the suit**.

*Lyle v. Jane Guinn Revocable Trust*, 365 S.W.3d 341, 355 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (internal citations and quotations omitted) (emphasis added).

> If the parties' agreement contemplates a continuing contract for performance, the limitations period does not usually commence until the contract is fully performed. **However, where the terms of an agreement call for fixed, periodic payments, a separate cause of action arises for each missed payment**.
>
> …
>
> The evidence in the record demonstrates that the parties treated their agreement as an installment contract whereby Gale-Sobel made monthly payments of commission to Davis Apparel . . . [A] separate cause of action arises for each missed payment under an installment contract. **Accordingly, Davis Apparel's claims for damages arising after December 1, 1996 [four years before Davis Apparel filed suit] were not barred by limitations**.

*Davis Apparel*, 117 S.W.3d at 18–19 (emphasis added) (internal citations omitted).

*See also Slusser v. Un. Bankers Ins. Co.*, 72 S.W.3d 713, 717 (Tex. App.—Eastland 2002, no pet.) ("Where the terms of an agreement call for fixed, periodic payments, a separate cause of action arises for each missing payment."); *F.D. Stella Prods. Co. v. Scott*, 875 S.W.2d 462, 466 (Tex. App.—Austin 1994, no writ) (statute of limitations runs separately on each missed monthly lease payment).

RMIT argues that *Davis Apparel* is distinguishable because the plaintiff in that case "clearly knew" that it was being underpaid its commissions, whereas RMIT allegedly did not know that it was being paid 5% instead of 9% until after

21

Texcel terminated the Agreement in 2012.[29]  In addition to ignoring the facts that

(i) RMIT received and reviewed detailed sales reports for more than ten years that

clearly listed the 5% commissions being paid on each of RMIT's sales and

(ii) there is evidence in the record that RMIT did in fact know that it was being

paid a 5% commission, RMIT's argument misses the point.  Limitations on a

breach of contract claim traditionally begins to run at the time of breach.  *Stine*, 80

S.W.3d at 592.  Even though Texcel asserted the statute of limitations as an

affirmative defense, RMIT never pleaded the discovery rule or any other ground

for deferring the accrual of its breach of contract claim.  *See Barker v. Eckman*,

213 S.W.3d 306, 312 (Tex. 2006) (for the discovery rule to apply, the plaintiff

must plead and prove the injury was inherently undiscoverable and objectively

verifiable."); *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988)

(requiring that a party plead and prove the discovery rule to avoid a defense of

limitations).   In fact, after Texcel briefed the limitations issue at the summary

judgment stage (in response to RMIT's motion for summary judgment requesting

damages beginning in **January 2008**), RMIT conceded that its damages were

limited to the commissions due to be paid in or after **September 2008**.[30]  Simply

put, RMIT has never before sought underpaid commission allegedly owed by

---

[29]Cross-Appellant's Brief, p. 15–16.

[30]*See* CR 305–306, 425–426.

22

Texcel before 2008, and it cannot make this argument for the very first time on appeal.

Notably, RMIT's argument throughout the entirety of this dispute—at least until this appeal—has been that it is entitled to underpaid commissions owed during the years 2008 to 2012, as succinctly explained by its own counsel at trial:

> We believe [Texcel] breached the contract by underpaying these commissions. **The commissions for the time frame from August of 2008, because those sales would have been paid as commissions at the end of September 2008, through February of 2012 is $97,986.67. Those are the actual damages**.
> …
> We filed this lawsuit – in September of 2012. **We would be entitled to four years – going back four years of damages, and that's how the calculation is**. That's why we start with the August [2008] sales because they're not paid until September [2008]. It's the money that's owed. That's what's owed in September [2008] going forward.

RR Vol. 2 at 17:24–18:4 (emphasis added); RR Vol. 3 at 173:11–16 (emphasis added). After trial, RMIT continued its request for underpaid commissions owed from September 2008 to February 2012 in its post-trial briefing. *See* CR 501 ("For the time frame of September 12, 2008 through the termination of the [Agreement] by Texcel effective February 29, 2012, Texcel underpaid commissions totaling $97,986.37."); CR 510–511 ("There is no factual dispute that Texcel underpaid the commissions it owed to RMIT under [the Agreement] by $97,986.37 in the time frame of September 2008 through February 2012. Thus, the credible evidence before the Court supports the conclusion that Texcel breached the [Agreement]

with RMIT and caused actual damages of $97,986.37."). The issue was therefore not tried by consent. *Johnston v. McKinney Am., Inc.*, 9 S.W.3d 271, 281 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (to determine whether an issue was tried by consent, it must appear the issue was actually tried, although not pleaded).

In conclusion, RMIT filed its breach of contract lawsuit on September 10, 2012. All of the actual damages awarded by the trial court—which are limited to underpaid commissions allegedly owed by Texcel from October 1, 2001 to May 1, 2006—are indisputably barred by the four-year statute of limitations applicable to breach of contract claims. This Court should reverse the trial court's judgment and, in light of the fact that RMIT waived its right to receive any alleged underpayments after May 1, 2006 (*i.e.*, more than four years before it filed suit), render a take nothing judgment against RMIT on all of its claims against Texcel.

## II. THE TRIAL COURT'S CONSTRUCTION OF THE AGREEMENT RENDERS THE "NOTE" MEANINGLESS.

The trial court found that Texcel breached the Agreement by reducing RMIT's commission rate because the Agreement required the reduction to be in writing and accepted by both parties.[31] RMIT argues that this is the only

---

[31]CR 554 at Finding No. 4.

24

"reasonable" interpretation of the Agreement.[32]  Both RMIT's and the trial court's construction of the Agreement, though, renders the "Note" meaningless.

Although the Agreement contains a boilerplate provision on the last page providing that "[a]ny **revisions** to this agreement must be done in writing and accepted by both parties,"[33] it also contains a very specific "Note" on the first page providing that "[i]t is understood that this [commission] rate will be evaluated after some time and **possibly adjusted as necessary to allow a greater territory expansion for RMIT as warranted and or a different commission rate**."[34]  This Note (i) was unique to the Agreement between RMIT and Texcel; (ii) was included for the express purpose of memorializing the parties' understanding that Texcel would, as territory became available, expand RMIT's territory and adjust its commission rate; and (iii) expressly allowed Texcel to expand RMIT's territory and adjust its commission rate.[35]  Because any such expansions or adjustments are expressly contemplated by the Agreement, they are clearly not "revisions" to the Agreement that are required to be in writing and accepted by both parties.  Any other construction renders the Note meaningless because, if the parties were

---

[32]Cross-Appellant's Brief, p. 19.

[33]RR Vol. 4 at 139 (emphasis added).

[34]RR Vol. 4 at 137 (emphasis added).

[35]Defendant's Excerpts of Deposition of Robert Penn (attached to Appellant's Brief as Exhibit 5) at 17:5–18:23. *See also* RR Vol. 2 at 47:1–48:19; RR Vol. 3 at 152:11–154:8.

required to formally revise the Agreement every time they expanded RMIT's territory or adjusted its commission rate, what would be the point of including the Note at all? It would be purely superfluous. Moreover, had the parties actually intended for a discussion and mutual agreement to be prerequisites for adjusting RMIT's territory and/or commission rate, they would have included such language in the Note—as they did in a separate provision of the Agreement:

> From time to time a specific order may suggest a mutually agreed upon commission rate. **This will be discussed and agreed upon at the time of quotation**.[36]

In adopting RMIT's construction of the Agreement, the trial court rendered the Note meaningless, and also failed to harmonize and give effect to all of its provisions—including the above-quoted provision that, unlike the Note, specifically requires the parties to discuss and agree upon certain commission rates. The trial court therefore erred in finding that Texcel breached the Agreement and in denying Texcel's request for declaratory relief. *El Paso Field Svcs., L.P. v. MasTex N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012) (courts must "examine and consider the entire writing in an effort to harmonize and give effective to all the provisions of the contract so that non will be rendered meaningless"); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994) (interpretation of an agreement should not render any material term meaningless). The Court should

---

[36]RR Vol. 4 at 137 (emphasis added).

therefore reverse the trial court's judgment in favor of RMIT, render judgment in favor of Texcel on its request for declaratory relief, and remand this case to the trial court with instructions to award Texcel its attorneys' fees.

## III. THE TRIAL COURT ERRED BY APPLYING COLORADO LAW.

Texas courts presume that Texas law applies, and it was RMIT's burden to (i) show that a true conflict of law exists and (ii) demonstrate which law should apply.[37] RMIT did not carry its burden.

Nothing in RMIT's Response disputes the facts that (i) Texcel is a Texas corporation with its principal place of business located in Houston, Texas;[38] (ii) Texcel drafted and executed the Agreement in Texas;[39] (iii) all customer invoicing and payments were sent from and received at Texcel's Houston office;[40] (iv) RMIT and Texcel conducted multiple business meetings in Houston;[41] (v) the decision to adjust RMIT's commission rate from 9% to 5%—the critical decision underlying RMIT's claims—was made in Houston, Texas;[42] (vi) RMIT's

---

[37] *PennWell Corp. v. Ken Assoc. Inc.*, 123 S.W.3d 756, 760–61 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *Compaq Computer Corp. v. LaPray*, 135 S.W.3d 657, 672 (Tex. 2004).

[38] *See* RR Vol. 3 at 139:8–140:8.

[39] *See* RR Vol. 2 at 44:13–16.

[40] *See* RR Vol. 3 at 45:5–23; *see also id.* at 148:20–149:6.

[41] RR Vol. 3 at 62:9–17.

[42] *See* RR Vol. 2 at 54:19–25, 55:12–17, 68:12–70:1.

commission checks were prepared in and mailed from Houston, Texas;[43] and (vii) the only relevant year in which RMIT's sales in Colorado exceeded 50% of its total territory was 2008.[44] Although RMIT places great emphasis on what it did outside of the State of Texas (including in states other than Colorado), the mere facts that RMIT is a Colorado entity that received its commission checks in Colorado and that, during certain discrete periods of time, sold more products in Colorado than the other territories for which it was responsible (*i.e.*, Wyoming, Montana, Western New Mexico, Western Idaho, and Utah) does not establish that Colorado has the "most significant relationship" with this dispute—much less that there is any conflict between the laws of the two states.

Moreover, RMIT does not even address Texcel's argument that the relevant Restatement factors of "certainty, predictability and uniformity of results" and "ease in determination and application of the law to be applied" weigh against the application of Colorado law in this particular case because the Colorado Statute does not define any of the terms it uses—including "knowingly"[45]—nor has any

---

[43]*See* RR Vol. 3 at 53:20–54:54:15.

[44]*See* Plaintiff's Trial Ex. 4 (attached to Appellant's Brief as Exhibit 6).

[45]As argued in Texcel's opening brief, the trial court erred in finding that Texcel acted "knowingly" in violation of the Colorado Statute. *See* Appellant's Brief, pp. 40–44.

28

Colorado court published an opinion interpreting its provision.[46] Accordingly, a Texas court is left with little to no guidance as to how to properly apply the statute—including whether to apply it to sales occurring outside of the State of Colorado (*see* Appellant's Brief, pp. 37–40) and when it is appropriate to find that a defendant acted "knowingly" in violation of the statute (*see* Appellant's Brief, pp. 40–44).

Because RMIT did not establish a true conflict of law or that Colorado has the most significant relationship with this dispute, and because the application of Colorado law leads to uncertainty, unpredictability, and inconsistent results, the trial court erred in applying Colorado law to this dispute. And, as more thoroughly discussed in Texcel's opening brief, the trial court incorrectly applied the Colorado Statute to all of the sales at issue in this dispute and also erred in applying an exceptionally low standard of proof in finding that Texcel acted "knowingly" in violation of the Colorado Statute. The Court should therefore vacate the trial court's award of $43,179.76 in additional damages under the Colorado Statute.

---

[46]*See Rader v. Electronic Payment Sys., LLC*, 2012 WL 4336175, at *3 (D. Colo. Sept. 21, 2012) (copy attached to Appellant's Brief as Exhibit 8) ("The statute does not attempt to define any of the terms it uses, nor has the Court located any published authority interpreting it."). *See also Med. Sales & Consulting Gp. v. Plus Orthopedics USA, Inc.*, 2011 WL 5075970, at *15–16 (S.D. Cal. Oct. 25, 2011) (copy attached to Appellant's Brief as Exhibit 8) ("Colorado's Supreme Court has not addressed the meaning of 'knowingly' in this statute . . . None of Colorado's intermediate courts have addressed the issue and a review of similar statutes in other jurisdictions and treatises do not provide any guidance.").

## IV. THE TRIAL COURT INCORRECTLY AWARDED ADDITIONAL DAMAGES TO INTECX, LLC.

In response to Texcel's assertion that additional damages under the Colorado Statute are punitive in nature and therefore could not have been assigned to the Appellee, Intecx, LLC (*see* Appellant's Brief, pp. 44–46), RMIT argues, without citing to any authority, that "it appears the additional damages remedy of the statute is actually remedial, and those additional damages are a supplement to the actual contractual damages that are recoverable . . . ."[47] RMIT bases its argument on the proposition that the purpose of the Colorado Statute "is to protect the value of the significant hours and efforts wholesale sales representatives spend in developing the market for the products of the manufacturers they represent."[48] RMIT's novel argument that additional damages under the Colorado Statute are "remedial" lacks any legal support and is simply incorrect.

For example, the purpose of the DTPA is to protect consumers. *See PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 85 (Tex. 2004). DTPA claims are not assignable because they are "punitive rather than remedial," particularly in light of the DTPA's treble damages provision. *Id.* at 89–91. As explained by the Texas Supreme Court, "[i]f DTPA claims can be assigned, a party excluded by the statute [*i.e.*, a non-consumer] could nevertheless assert

---

[47]Cross-Appellant's Brief, pp. 30–32.

[48]*Id.* at 31.

30

DTPA claims by stepping into the shoes of a qualifying assignor. This would frustrate the clear intent of the Legislature." *Id.* at 85.

Similarly, as discussed in Texcel's opening brief, even if the underlying Agreement and breach of contract claim could have been assigned to Intecx, LLC, a statutory claim for treble damages under the Colorado Statute is personal and punitive in nature, and is therefore not assignable. RMIT does not even address Texcel's comparison of the Colorado Statue to the DTPA, much less cite to any authority demonstrating that, unlike the DTPA, treble damages under the Colorado Statute are intended to be remedial as opposed to punitive in nature.

In fact, such additional damages cannot be remedial—in that they do not simply compensate RMIT for its alleged injuries—because the "value of the significant hours and efforts" spent by RMIT was already built in to the commission rate Texcel paid to RMIT. RMIT bargained for a commission structure that was intended to fully compensate RMIT for developing the market for Texcel's products in RMIT's sales territory, and it is therefore those commissions to which RMIT is entitled in actual damages—not three times those commissions. *See PPG Indus., Inc.*, 146 S.W.3d at 89 ("DTPA claims generally are also punitive rather than remedial . . . Economic damages and attorney's fees are certainly remedial, but they were recoverable in contract and warranty long

before the DTPA was passed. The DTPA adds mental anguish and punitive damages—damages that could hardly be more personal.").

The Colorado Statute's treble damages provision is clearly intended to punish manufacturers who underpay their wholesale sales representatives, and to deter others from engaging in similar conduct. There is no authority to support RMIT's contention that such damages are actually remedial simply because the statute is intended to protect wholesale sales representatives. A claim for treble damages under the Colorado Statute is therefore not assignable, and the trial court erred by awarding $43,179.76 in additional damages to Intecx, LLC.

## CONCLUSION AND PRAYER

Appellant, Trelltex, Inc. d/b/a Texcel, requests that this Court (i) overrule the sole point of error raised by Appellee, Intecx, L.L.C. d/b/a Rocky Mountain Industrial Technologies, (ii) reverse the trial court's April 24, 2014 Final Judgment in favor of Appellee, (iii) render a take-nothing judgment on Appellee's claims, (iv) render judgment in favor of Appellant on its request for declaratory relief, and (v) remand this case to the trial court with instructions to award Appellant its attorneys' fees.

Respectfully submitted,

DOW GOLUB REMELS & BEVERLY, LLP


By: /s/ Keith M. Remels
     Keith M. Remels
     Texas Bar No. 16765800
     kremels@dowgolub.com
     Stephanie A. Hamm
     Texas Bar No. 24069841
     sahamm@dowgolub.com
     9 Greenway Plaza, Suite 500
     Houston, Texas 77046
     Telephone: (713) 526-3700
     Facsimile: (713) 526-3750

ATTORNEYS FOR APPELLANT
TRELLTEX, INC. d/b/a TEXCEL


## CERTIFICATE OF COMPLIANCE

Pursuant to the Texas Rules of Appellate Procedure, the undersigned certifies this Brief complies with the type-volume limitations of Texas Rule of Appellate Procedure 9.4:

1.    This Brief complies with the type-volume limitations of Texas Rule of Appellate Procedure 9.4 because this brief contains 8,006 words, excluding the parts of the Brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

2.    This brief complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-pt Times New Roman (Footnotes in 12-pt.)


/s/ Stephanie A. Hamm
Stephanie A. Hamm


33

## CERTIFICATE OF SERVICE

This is to certify that, on March 13, 2015, a true and correct copy of foregoing was forwarded to all counsel of record electronically and via certified mail, return receipt requested.

Howard R. King
P.O. Box 5379
Kingwood, Texas 77325


/s/ Stephanie A. Hamm
Stephanie A. Hamm